IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MDR UNITED, LLC,<br>　　　　　　**Plaintiff,**<br><br>　　　　v.<br><br>**BACKPORCH PARTNERS, INC.,**<br>**BROCK WARNER, JANELLE WARNER,**<br>**BISONWORKS, LLC, and JUSTIN**<br>**MORRIS,**<br>　　　　　　**Defendants.** | **CIVIL ACTION**<br><br><br>**NO.  25-4532** |

**MEMORANDUM**

**HODGE, J.**                                                                                                **June 5, 2026**

Before the Court is Plaintiff/Counterclaim Defendant MDR United, LLC's ("MDR")

Motion to Dismiss Counterclaim (ECF No. 22 (the "Motion")), Defendant/Counterclaim Plaintiff

Backporch Partners, Inc.'s ("Backporch") Opposition (ECF No. 30 (the "Opposition")), the reply

thereto, and supplemental briefing. For the following reasons, the Motion is granted in part and

denied in part.

**I.      BACKGROUND**

**A.      Factual Background**[1]

The facts as pled in the Counterclaim are as follows.[2] In 2020, Defendants Brock and

Janelle Warner (the "Warners") learned about the Mighty Dog Roofing franchise system and

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

[2] The Court also considers documents attached to the pleadings that are integral to the Counterclaims, including Exhibit A to the Complaint (ECF No. 1-1) and Exhibit A to the Motion to Dismiss (ECF No. 22-6). *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court cannot consider the Affidavit of Joshua Skolnick in connection with the Rule 12(b)(6) Motion, *see Davis v. Wells Fargo*, 824 F.3d 333, 351 (3d Cir. 2016), and even if it could, there is no explanation as to why Joshua Skolnick, who the affidavit states is a founding partner and majority shareholder/member of HPB Foam LLC, would have relevant knowledge as to MDR. (ECF No.

became interested in purchasing a franchise to operate in the Nashville, Tennessee area. (ECF No. 17 at 17–31 (the "Counterclaim"), ¶ 17.) In connection with a future franchise agreement, MDR provided the Warners with an MDR Unit Economics Excel Worksheet ("Workbook") containing information on financial performance of Mighty Dog Roofing franchises, which Backporch[3] claims was selective and misleading. (*Id.* ¶ 19.) MDR subsequently provided the Warners with a copy of its Franchise Disclosure Document ("FDD"), dated April 29, 2021, which contained information identical to the Workbook. (*Id.* ¶ 20.) Backporch alleges that MDR failed to disclose that the two franchises whose financial performance were shown in these documents were operating under terms not available to any new franchisees that gave those two existing franchises reduced royalty rates and reduced operational costs. (*Id.* ¶ 21.)

On or about May 27, 2021, in reliance on the information in the Workbook and FDD, the Warners acquired four territories from MDR by executing four Franchise Agreements. (*Id.* ¶ 25.) On July 28, 2021, the Warners assigned their individual ownership interest in each Franchise Agreement to Backporch. (*Id.* ¶ 25 n.1; *see* ECF No. 1-1 at 94–97 (the "Assignment Agreement").) On an unspecified date, the Warners executed a Multi-Unit Addendum and paid a multi-unit initial franchise fee of $159,000 to MDR. (Counterclaim ¶ 25.)

After the Warners opened their franchise, Backporch alleges that it became clear that MDR had sold the franchise opportunity without possessing the personnel, infrastructure, or resources to meet its obligations to the Warners under the Franchise Agreement. (*Id.* ¶ 26.) Mr. Warner raised his grievances with MDR on numerous occasions and did not receive any assistance. (*Id.* ¶ 29.)

---

22-5.) The Court also does not consider Exhibit B to the Motion to Dismiss (ECF No. 22-7), an FDD with an issuance date of April 29, 2022, because it is not referenced or relied on in the Counterclaim.

[3] On July 28, 2021, the Warners transferred their interest in the franchises to Backporch with the consent of MDR. (ECF No. 1-1 at 94–97.)

Specifically, Backporch lists the following material breaches of the Franchise Agreements by MDR:

> (a) failure to provide local SEO optimization during the first year of operations in breach of Paragraph 3.6 of the Franchise Agreement;
>
> (b) failure to establish national advertising and brand promotion in breach of Paragraph 3.7 of the Franchise Agreement;
>
> (c) failure to provide an operational Call Center field and manage all calls despite collecting a call center fee in accordance with Paragraph 3.9 of the Franchise Agreement; and
>
> (d) failure to conduct market appropriate local advertising and promotion in breach of Paragraph 12.5.2 of the Franchise Agreement.

(*Id.* ¶ 27.)

On or about July 10, 2025, the Warners sent MDR a letter rescinding the Franchise Agreements. (*Id.* ¶ 29.) The letter stated that effective July 18, 2025, Backporch would cease operation of the franchised business. (ECF No. 17-3 at 5.)

## B.    Procedural History

On August 9, 2025, MDR filed its Complaint against Defendants Backporch, the Warners, Bisonworks LLC, and Justin Morris (collectively, "Defendants") asserting five specific breach of contract claims. (ECF No. 1.) Defendants answered the Complaint on September 22, 2025. (ECF No. 17 at 1–17.) Additionally, Backporch filed a Counterclaim against MDR. (*Id.* at 17–31.) The Counterclaim asserted the following claims: (1) fraudulent misrepresentation; (2) negligent misrepresentation; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) violation of the Tennessee Consumer Protection Act ("TCPA"); and (6) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (collectively, the "Counterclaims"). (*Id.*) On October 13, 2025, MDR filed its Motion pursuant to Rules 12(b)(6), 12(b)(1), and 9(b), and requested attorneys' fees and costs pursuant to the Franchise Agreements.

## II.    LEGAL STANDARD

A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint. *Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC*, 498 F. Supp. 3d 725, 732 (E.D. Pa. 2020). In order to survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. at 678 (citation omitted). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Applying the principles of *Iqbal* and *Twombly*, the Third Circuit has articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). This three-prong inquiry involves the following: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012). Where a Rule 12(b)(1) motion is filed prior to an answer, it will be considered a facial challenge to jurisdiction, *i.e.*, that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *See Hendrick v. Aramark Corp.*, 263 F. Supp. 3d 514, 517 (E.D. Pa. 2017). When

4

considering a facial challenge, a court must apply the same standard of review as it would for a motion to dismiss under Rule 12(b)(6). *Id.*

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b)'s particularity requirement, a plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged" and "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (citation modified). In short, a plaintiff must provide "the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted).

## III.    DISCUSSION

### A.    What Law Applies

Throughout the briefing, the question of which state's law applies permeates several issues. "A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994). When a transaction bears a "reasonable relationship to the state whose law is governing," Pennsylvania courts have traditionally upheld contractual choice of law provisions. *See Hopkins v. GNC Franchising, Inc.*, No. 05CV1510, 2006 WL 2266253, at *3 (W.D. Pa. Jan. 13, 2006) (internal citation omitted). The scope of a choice of law provision may determine if such a clause applies to tort and quasi-contract claims. *See Lipman Bros., Inc. v. Apprise Software, Inc.*, No. CIV.A. 13-4439, 2015 WL 4476983, at *2 (E.D. Pa. July 22, 2015). Here, the Franchise Agreements contain a choice of law provision

dictating that Pennsylvania law governs. (*See, e.g.*, ECF No. 1-1 at 51 ("This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principles.").)

MDR asserts that the laws of Pennsylvania govern all of the Counterclaims. Backporch's choice of law position is less consistent or clear. In its Opposition, Backporch argues that the choice of law provision only applies to the contract claims, as opposed to pre-contractual, tort-based claims, and as a result the Pennsylvania statute of limitations cannot apply to Counts I (fraudulent misrepresentation) and II (negligent misrepresentation). (ECF No. 30-1 at 8–9.) Backporch was silent it its Opposition regarding which state's statute of limitations it believes should apply. However, in its supplemental brief and for the first time, Backporch argues that Tennessee law applies to Counts I and II. Backporch's Opposition made no mention of Tennessee law applying to these claims—to the contrary, it addressed Pennsylvania law only throughout the Opposition, aside from its statute of limitations and TCPA claim arguments. Because Backporch did not raise its argument that Tennessee law applies to Counts I and II until its supplemental briefing, the Court disregards the argument. *See Pace v. Baker-White*, 432 F. Supp. 3d 495, 509 n.12 (E.D. Pa. 2020) (disregarding argument raised in supplemental briefing that was not responsive to the court's request).

As for Count V (the TCPA claim), however, the issue of which law applies was addressed by the parties in the Motion and Opposition. In arguing that the Franchise Agreements contain a valid choice-of-law provision and thus the TCPA claim must be dismissed, MDR points to *Cottman Transmission Sys., LLC v. Kershner*, 492 F. Supp. 2d 461 (E.D. Pa. 2007). The plaintiff in *Cottman*, a franchisee whose franchise agreement designated Pennsylvania as governing law, sought to amend its complaint to include claims under consumer protection statutes of Arizona,

Delaware, Florida, Massachusetts, Nevada, New Hampshire, North Carolina, Ohio, Oklahoma, Texas, Utah, and New Jersey. *Id.* at 471. The court found that such amendment would be futile because none of those states' respective consumer protection statutes "expressed a 'fundamental policy' that would be defeated by applying the choice-of-law provision to preclude the non-Pennsylvania consumer protection claims. Importantly, these consumer protection statutes do not appear to have anti-waiver provisions . . . that would indicate a legislative intent to express such a fundamental policy." *Id.* When a strong public policy interest conflicts with applying a contractual choice of law provisions, Pennsylvania courts will ignore the contractual provision. *See Hopkins*, 2006 WL 2266253, at *3 (citing *Kruzits*, 40 F.3d at 56).

But unlike the state consumer protection laws at issue in *Cottman*, the TCPA does have an anti-waiver provision. *See* Tenn. Code Ann. § 47-18-113 ("Any provision in any agreement . . . requiring the application of the laws of another state with respect to any claim arising under [the TCPA] . . . is void as a matter of public policy."). This anti-waiver is a fundamental Tennessee policy. *See Lipman Bros. v. Apprise Software, Inc.*, No. CIV.A. 13-4439, 2015 WL 4476983, at *8 (E.D. Pa. July 22, 2015).[4] Because of the TCPA's anti-waiver provision, Pennsylvania law cannot apply to the TCPA claim.

### B.    Whether Backporch Has Standing for Pre-Sale Claims

MDR argues that because Backporch's Counterclaims I, II, V and VI are all based on pre-sale misrepresentations and omissions, Backporch lacks standing. (ECF No. 22-1 at 24.) MDR claims that because Backporch did not enter into the franchise relationship until July 29, 2021,

---

[4] The *Lipman* court ultimately determined that, in balancing policy interests underlying Pennsylvania law, Pennsylvania law would apply the parties' contractual choice over the TCPA, therefore making the TCPA claim unavailable. 2015 WL 4476983, at *8. However, the *Lipman* court specifically applied Pennsylvania's conflicts of laws principles, which the choice of law provision in the Franchise Agreements here explicitly stated it would not reference.

when the Warners transferred their interest to it, Backporch could not have relied on any alleged misrepresentations made to the Warners before that date. (*Id.*)[5] Backporch argues that as the assignee of the Franchise Agreements, it has standing to assert contractual and equitable rights in place of the Warners. (ECF No. 30-1 at 5.)

Whether Backporch has standing is resolved by the Assignment Agreement. Neither party disputes that the assignment is effective. (ECF No. 30-1 at 5; ECF No. 22-1 at 24.) Under Pennsylvania law, where an assignment is effective, "the assignee stands in the shoes of the assignor and assumes all of his rights." *Smith v. Cumberland Group, Ltd.*, 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997) (collecting cases). The *Cumberland* court held that "when parties of equal bargaining positions execute a cont[r]act without restrictions on assignability . . . they must be bound by that provision and not be permitted to avoid the consequences of such an action by specious challenges." *Id.* at 1173 (citing *Borough of Ambridge Water Auth. v. Columbia*, 328 A.2d 498, 501 (Pa. 1974)). Among the rights possessed by the assignee are the remedies the assignor once possessed. *Id.* at 1172.

The Assignment Agreement, titled "Consent to Transfer Agreement," is contained in Exhibit A to MDR's Complaint. (ECF No. 1-1 at 94.) The Franchise Agreements entered into by the Warners provided that the franchisee, the Warners, could assign their rights under the franchise agreements to a corporation or limited liability company with the consent of MDR. (*Id.*) The Assignment Agreement states that the Assignor, Brock Warner, agrees to transfer all rights to the Assignee, Backporch. (*Id.* at 95.) It further states that MDR, the franchisor, consents to the Transfer

---

[5] MDR also claims that the Assignment of the Franchise Agreements to Backporch expressly released claims between the Warners and Backporch. That release only applied to "any claim or cause of action released by this Agreement." (ECF No. 1-1 at 96.) For purposes of clarity, this section only addresses MDR's standing arguments, and the releases in the Agreement are addressed *supra*.

subject to the terms and conditions of the Agreement. (*Id.* at 94.) The Assignment Agreement is signed by Josh Skolnick and Zachery Beutler, Managing Members at MDR, as well as Brock and Janelle Warner. (*Id.* at 96.) Backporch is identified as the Assignee on the signature page and Brock Warner's signature sits below it. (*Id.*)

Because the Assignment Agreement contains language that expressly assigns Brock and Janelle Warner's rights under the Franchise Agreements to Backporch, and because neither party disputes the effectiveness of the Assignment Agreement, and because Pennsylvania law provides for the assignment of rights via effective assignment, Backporch stands in the shoes of the Warners and has standing to bring Counts I, II, V and VI.

### C. The General Release and the Fraud Release

MDR argues that all of the Counterclaims are barred by two valid and legally enforceable general releases: one in the July 28, 2021 Assignment and Consent to Transfer Agreement (ECF No. 1-1 at 94–97), and the other contained in the October 19, 2022 Negotiated Amendment, both of which are attached to the Complaint. (ECF No. 22-1 at 6.)

The July Assignment defines Brock Warner as the Assignor, and the agreement transfers his interest to Backporch, with the consent of MDR. (ECF No. 1-1 at 94.) The agreement further defines MDR as the "Franchisor" and Brock and Janelle Warner as "Guarantors." (*Id.*) That Assignment contains the following paragraphs:

> 4. Release by Assignor. Upon execution of this Agreement and as partial consideration for Franchisor's consent to the Transfer, Assignor, for himself and all persons and entities claiming by, through or under him, hereby release, acquit, and forever discharge Franchisor and all of its current and former affiliates, subsidiaries, officers, directors, employees, agents, successors and assigns (the "Franchisor Releasees") from all obligations, claims, debts, demands, covenants, contracts, promises, agreements, liabilities, costs, attorneys' fees, actions or causes of action whatsoever, whether known or unknown, which Assignor, for himself or on behalf of, or in conjunction with any other person, persons, partnership or corporation, have, had or claim to have against the Franchisor Releasees through the date of this

9

Agreement, including those arising out of or related to: (i) the offer, sale, and operation of the Franchised Business; (ii) the Franchise Agreements and the parties' respective rights or obligations under the Franchise Agreements or any other agreement between the parties; and (iii) any and all rights, obligations or claims under any state franchise regulations or franchise relationship laws. Assignor warrants and represents that he has not assigned or otherwise transferred any claim or cause of action released by this Agreement.

 5. Release by Assignee and Guarantors. Upon execution of this Agreement and as partial consideration for Franchisor's consent to the Transfer, Assignee and Guarantor, for themselves and all persons and entities claiming by, through or under any of them, hereby release, acquit, and forever discharge the Franchisor Releasees from all obligations, claims, debts, demands, covenants, contracts, promises, agreements, liabilities, costs, attorneys' fees, actions or causes of action whatsoever, whether known or unknown, which Assignee, by itself or on behalf of, or in conjunction with any other person, persons, partnership or corporation, have, had or claim to have against the Franchisor Releasees through the date of this Agreement, including any claims or causes of action arising out of or related to the Transfer (and any assets associated therewith) and/or any other claims or causes of action under any federal or state franchising laws.

(ECF No. 1-1 at 95–96.) While the Agreement does not explicitly define Assignee, because the document states that the Assignor is transferring its rights and obligations under the Franchise Agreements to Backporch, logic would dictate that the Agreement can only be understood to consider Backporch as the Assignee.

The October 19, 2022 Amendment to the Franchise Agreement defines MDR, the Warners, and Backporch similarly, although it explicitly defines Backporch as the Assignee, and both Backporch and the Warners as Franchisee. That document also contains a release, which is highly similar to the release language above, with one slight modification:

. . . . hereby release, acquit, and forever discharge Franchisor . . . from all obligations, claims, debts, demands, covenants, contracts, promises, agreements, liabilities, costs, attorneys' fees, actions or causes of action whatsoever, whether known or unknown, which Franchisee, by themselves or on behalf of, or in conjunction with any other person, persons, partnership or corporation, have, had, or <u>might</u> claim to have against the Franchisor Releasees through the date of this Amendment, including those arising out of or related to: (i) the offer, sale, and transfer of the franchise rights granted under the Franchise Agreements; and (ii) any and all rights, obligations or claims under any state franchise regulations or franchise relationship laws.

10

(ECF No. 1-1 at 226 (emphasis added).)

MDR argues that all six Counterclaims are extinguished by these releases because they concern conduct occurring before October 19, 2022. (ECF No. 22-1 at 9.) In opposition, Backporch asserts that Pennsylvania law does not permit extinguishing claims that have not yet accrued, and that none of Backporch's Counterclaims had accrued by October 19, 2022.

Pennsylvania courts have upheld releases extinguishing claims that have not yet accrued. *See, e.g.*, *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733, 735 (Pa. 1989) (finding unaccrued claims barred where contract released "known or unknown, suspected or unsuspected, past, present and future claims"); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 894 (3d Cir. 1975) (finding unaccrued claims barred where the contract released claims "ever had, now have or which they or any of them hereafter can, shall or may have"). These and other courts upheld such releases because a signed release is a contract—and so, it is upheld in the absence of fraud, accident, or mutual mistake with respect to the release. *Buttermore*, 561 A.2d at 735.

But unlike *Buttermore* and *Three Rivers*, the releases in the Franchise Agreements did not explicitly contemplate future claims. Rather, the releases bar claims that Backporch and the Warners "have, had, or might claim to have." Notably absent from this release, in contrast to cases MDR cites, is language releasing "future claims" or "unaccrued claims" or claims they hereafter may have. While the releases encompass unknown claims, an unknown claim is distinct from an unaccrued claim. As the *Schaefer v. HPB Foam LLC* court noted in addressing an identical release, "[t]he use of the term unknown claims presupposes the existence of those claims. North America, for example, was unknown to Western Europe for centuries, yet North America existed. The unknown claims do not encompass unaccrued claims as the latter do not exist as claims." No. CV 24-6298, 2025 WL 1888207, at *10 (E.D. Pa. July 8, 2025).

11

Moreover, the releases are limited to claims the Franchisee has, had, or might claim to have "through the date of this Amendment [or Agreement]." In this way, the releases differ from that in *Front St. Dev. Assocs., L.P. v. Conestoga Bank*, 161 A.3d 302 (Pa. Super. Ct. 2017), which MDR asserts upheld a similarly broad release. In *Front Street*, the court found claims later accrued to be released because "when read in the context of the Agreement as a whole, [the release] was intended to release claims that would accrue in the future and which arose from or were remotely related to the Loan Documents." 161 A.3d at 312. However, the release in *Front Street* was broader in a key respect: the released claims were not limited through any specified date.

Under Pennsylvania law, a fraud claim accrues "when a party knew or should have reasonably known of the injury and its causes." *Perelman v. Adams*, 945 F. Supp. 2d 607, 614 (E.D. Pa. 2013). Backporch argues that the fraud claims were not known and could not reasonably have been known by October 19, 2022 and therefore those claims are not encompassed within the release. Backporch further argues that the breach of contract claims did not accrue until well after this release, as they only accrued when MDR failed to perform its ongoing contractual obligations and Backporch suffered damages. Because the releases do not contemplate claims that accrue after the date of the release, the remaining question is when the Counterclaims accrued. Because the allegations in the Counterclaim do not establish when the Counterclaims accrued, the Counterclaims cannot be dismissed under the general releases at this stage. *C.f. Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017).

In addition to the general releases, the Franchise Agreements contain a release specific to claims of fraud. This release provides:

> 18.9.1 Franchisee hereby waives the right to obtain **any remedy** based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly

12

provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

(ECF No. 1-1 at 53 (emphasis added); *see also id.* at 186–87.) MDR frames this provision as a limitation on remedies and argues that it applies to the relief Backporch seeks. Backporch argues that this provision is void because Pennsylvania law prohibits contractual waivers of liability for intentional misconduct, including fraud, and thus it contravenes public policy.

Provision 18.9.1 is an exculpatory provision—while MDR suggests it is a limitation, it expressly waives the right of Franchisee to obtain "*any* remedy based on alleged fraud, misrepresentation, or deceit." Under Pennsylvania law, exculpatory provisions are enforceable when three conditions are met: (1) the clause must not contravene public policy; (2) the contract is between persons concerning their private affairs; and (3) each party must be a free bargaining agent. *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1199 (Pa. 2012). Avoiding a contract on public policy grounds requires a showing of overriding public policy from case law, governmental practice, or obvious moral or ethical standards. *Id.* Exculpatory clauses that release a party from negligence are generally not against public policy. *Id.* at 1200. But releases for intentional or reckless tortious conduct are prohibited. *Id.* at 1200, 1203.

Backporch brings misrepresentation claims based on intentional as well as negligent conduct. Specifically, the fraudulent misrepresentation claim in Count I requires intentional conduct, while the negligent misrepresentation claim in Count II does not. *See Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (explaining that negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of

13

the truth of these words"). Counts V and VI are pled as "willing and knowing" (Counterclaim ¶¶ 60, 68), which suggests intentional conduct.

Provision 18.9.1 cannot release claims for intentional or reckless tortious conduct because such a release is against public policy. However, it does not contravene public policy for this provision to release a negligence claim. The Court finds that Count II is released pursuant to this provision, but Counts I, V, and VI are not released.[6] Pursuant to the Franchise Agreements' severability provisions, this provision is "deemed modified to the extent necessary to make it valid or operative." (ECF No. 1-1 at 190.)

### D.    Statute of Limitations

MDR next argues that all of the Counterclaims are barred by the one-year contractual limitation period set forth in the Franchise Agreements.[7] (ECF No. 22-1 at 10.) Moreover, it argues that the Pennsylvania law statute of limitations imposes a two-year bar for claims sounding in fraud and negligence. (*Id.* at 11 (citing 42 Pa. C.S.A. § 5524(7); *Padalino v. Standard Fire Ins. Co.*, 616 F. Supp. 2d 538, 546 (2008)).)

---

[6] While Provision 18.9.1 does not explicitly reference future or unaccrued claims, the pivotal question is whether the claim "can be said fairly to be within the contemplation of the parties." *Schaefer*, 2025 WL 1888207, at *9 (citing *Farrell v. Lechmanik, Inc.*, 611 A.2d 1322, 1323–33 (Pa. Super. Ct. 1992)). The provision here explicitly mentions fraud and misrepresentation, thus reflecting that the parties intended to limit any remedy based on those claims. Pennsylvania courts have upheld negligence releases executed before the claim accrues. *See, e.g., Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1176, 1194–95 (Pa. 2010) (upholding a negligence release signed when the plaintiff purchased her ski season pass against claims of negligent operation of a ski lift).
[7] "Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction, or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off." (ECF No. 1-1 at 52, 186.)

14

"A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017); *see Mr. Sandless Franchise*, 498 F. Supp. 3d at 737 (finding an insufficient record to determine whether counts are timely under the contractual limitation period). It is not apparent from the Counterclaim when Backporch's claims accrued.[8] Therefore, dismissal at this stage is improper.

### E.    The Fraudulent Misrepresentation Claim

MDR raises three further arguments as to why Count I should be dismissed: (1) Backporch fails to meet the Rule 9(b) pleading standard; (2) Backporch cannot show justifiable reliance; and (3) the gist of the action and economic loss doctrines bar Count I.[9]

### 1.    Rule 9(b)

In order to successfully plead fraudulent misrepresentation, Backporch must plead the misrepresentations with particularity under Rule 9(b)'s particularity standard. Rule 9(b) requires a plaintiff to identify "the who, what, when, where and how" of the alleged fraud. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted); *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (explaining that a state law fraudulent misrepresentation claim must be pled with particularity under Rule 9(b)). "The purpose of Rule 9(b) is to provide a defendant with notice of the precise misconduct with which he or she

---

[8] MDR argues that Backporch's claim that MDR failed to provide local SEO optimization during the first year of operations is clearly barred by the contractual limitations provision. There are no allegations in the Counterclaim addressing when operations of the franchise began. While the timing of the signed agreements suggests that the first year of operations may have concluded before September 2024, the Court cannot make such a determination based on speculation. Moreover, it is not clear from the Counterclaim when the other asserted breaches of contract occurred, and so the claim cannot be dismissed at this stage.

[9] MDR raised these arguments as applied to both Counts I and II, but because Count II is released pursuant to Provision 18.9.1, the Court does not address that count here.

is charged and to prevent false or unsubstantiated charges." *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 720 (E.D. Pa. 2013) (quoting *Cooper v. Broadspire Servs., Inc.*, No. Civ. A 04-5289, 2005 WL 1712390, at *5 (E.D. Pa. July 20, 2005)).

Backporch alleges that MDR's Director of Franchise Development, Mr. Zach Beutler, provided the Warners with the Workbook on or about March 2, 2021,[10] which contained misleading financial performance representations based on data from two established MDR franchises, although the Workbook reflected that there were eight franchises operating in that time period. (Counterclaim ¶¶ 18–19.) Further, Backporch alleges that MDR provided the Warners with a copy of the FDD, and that Item 19 of the FDD was identical to the Workbook. (*Id.* ¶ 21.)[11] Item 19 and the Workbook failed to disclose that the two franchises whose data was shown were operating under grandfathered terms, including reduced royalty rates and operational costs, which were not available to any new franchisees. (*Id.*) Additionally, Backporch alleges that Item 6 failed to disclose the mandatory requirement for all franchisees to employ a roof qualifier. (*Id.* ¶ 23.) Backporch further alleges that Item 11 of the FDD contained false and misleading assertions regarding training that MDR provides. (*Id.* ¶ 24.)

Backporch sufficiently pleads the who: MDR, including Mr. Beutler; what: selective financial data of franchises subject to different terms, false assertions regarding training MDR provides, and failure to disclose mandatory requirement to employ a roof qualifier; when: early 2021; and where: the Workbook and FDD. Backporch pleads that MDR provided the false and

---

[10] The Counterclaim states: "On or about March 2, 2022, prior to the execution of the Franchise Agreement . . . ." (Counterclaim ¶ 18.) Because the Franchise Agreement was executed in May 2021, the Court understands the use of "2022" to be in error.

[11] In its Opposition, Backporch asserts that the Workbook contained "materially different and more favorable financial projections than those in the FDD." (ECF No. 30-1 at 11.) The Court disregards this assertion as it contradicts the Counterclaim, which is a binding judicial admission. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008).

misleading information in order to induce it to enter into the Franchise Agreements. These allegations are sufficient to meet Rule 9(b)'s particularity standard as to the alleged misrepresentations in the Workbook and the FDD.[12]

In an effort to seemingly throw every argument at the wall to see what sticks, MDR briefly challenges Backporch's allegations related to Items 6 and 11 in the FDD as failing as a matter of law. First, MDR argues that it disclosed all required fees under Item 6 because it asserts, without citation, that FTC Rules only require disclosure of ongoing fees payable to the franchisor or its affiliates, and not to third parties. (ECF No. 22-1 at 13.) However, the applicable rule requires disclosure of "all other fees that the franchisee must pay to the franchiser or its affiliates, *or that the franchisor or its affiliates impose or collect in whole or in part for a third party*." 16 C.F.R. § 436.5(f) (emphasis added). Because Backporch alleges that MDR failed to disclose its mandatory requirement for franchisees to employ a roof qualifier, Backporch has alleged that this fee is imposed by MDR for a third party.

MDR then argues that Backporch's allegations related to Item 11 sound in contract rather than fraud. (ECF No. 22-1 at 13 (citing *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 479 (E.D. Pa. 2010).[13]) However, a statement of intention "may constitute a fraudulent misrepresentation of fact" if the statement was false at the time it was uttered. *Bennett*, 682 F. Supp. 2d at 479.

---

[12] In its reply, MDR argues that the Workbook was not attached to the Counterclaim and there are insufficient allegations describing it, leaving MDR unable to respond to the assertions. As this argument was not raised until the reply, the Court may, and does, deem it waived. *See United States v. Cruz*, 757 F.3d 372, 387–88 (3d Cir. 2014). Even so, the Counterclaim alleges specifically that Mr. Beutler sent the Workbook, which is an Excel document, on or about March 2, 2021. (Counterclaim ¶ 18.) The Counterclaim further alleges that the information in the Workbook was identical to Item 19 of the FDD. (*Id.* ¶ 21.) The Counterclaim thus provides sufficient notice to MDR of the precise misconduct Backporch alleges.

[13] MDR includes a parenthetical quotation purportedly from this case. The Court has reviewed the case and is unable to locate the quoted language included in the Motion. Rather, the case asserts that "promises to do future acts do not constitute a valid fraud claim." 682 F. Supp. 2d at 479.

Backporch alleges that MDR provided false and misleading statements regarding training it provides in order to induce it to invest in the franchise, which can support a fraudulent misrepresentation claim if the statements were false at the time they were uttered.

### 2. Justifiable Reliance

To prove fraud, a party must show justifiable reliance on the alleged misrepresentation. *See Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). MDR argues that the Franchise Agreements' integration clauses and specific disclaimer of reliance prevent Backporch from being able to establish justifiable reliance.

The parol evidence rule applies to integrated contracts and prevents the use of extrinsic evidence to nullify, modify, or augment the terms of the contract. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 212–13 (3d Cir. 2022). However, the parol evidence rule on its own does not prevent fraudulent inducement claims arising from integrated contracts because the purpose of such extrinsic evidence "is to prove a precontractual misrepresentation or concealment – not to alter or vary the terms of the contract." *Id.* at 213. But fraud-insulating clauses, such as a no-reliance clause, or a provision stating that representations in the contract are the only representations made, extend the parol evidence rule. *Id.* In that circumstance, "due to the parol evidence rule's operation, a party cannot be said to have justifiably relied on prior representations that he has superseded and disclaimed." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007).

The integration clause in the Franchise Agreements states:

This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be modified except by a written document signed by both parties. **Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee**.

(ECF No. 1-1 at 55, 189 (emphasis added).) While MDR describes this provision as "an integration clause that disclaimed reliance on representations outside the Franchise Agreements" (ECF No. 22-1 at 15), that contention is directly contradicted by the plain language of the provision. Rather, this fraud-insulating clause expressly does not disclaim representations made in the FDD.

The Workbook, however, is not carved out in this provision. Because the integration clause provides that there are no other representations between the parties, aside from the FDD, it "prevents the use of extrinsic evidence to vary the fraud-insulating term. And without such evidence, it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." *SodexoMAGIC*, 24 F.4th at 214; *see, e.g.*, *1726 Cherry St. P'ship by 1726 Cherry St. Corp. v. Bell Atl. Props., Inc.*, 653 A.2d 663, 670 (Pa. Super. Ct. 1995) (barring parol evidence where "the agreement states that it is the parties' entire agreement and that there are *no* other representations or understandings between them"). Under the Third Circuit's clear pronouncement in *SodexoMAGIC*, Backporch cannot prove justifiable reliance based on the Workbook.

MDR goes on to argue that a review of the FDD itself contradicts the allegations in the Counterclaim. In support of its argument, MDR points to various disclaimers that it asserts should have prevented Backporch from relying exclusively on those financial projections. However, while Item 19 notes that the financial projections do not include specific fees and expenses (ECF No. 22-6 at 58–59), such a disclaimer does not fully contradict the allegations, which must be accepted as true at this stage. Backporch alleges that MDR selectively showed financial projections from two franchises operating under different terms, including reduced royalty rates and reduced operational costs, even though there were eight franchises operating during that time. (Counterclaim ¶¶ 19, 21.) Whether various disclaimers included with Item 19, and whether Brock Warner's affirmance that he understands Item 19 "is not a representation of what [the franchisee]

19

can expect to achieve in connection with the operation of a Franchised Business" (ECF No. 1-1 at 129), is a fact question not properly addressed at this stage.

### 3.    Gist of the Action and Economic Loss Doctrine

Under Pennsylvania law, the gist of the action doctrine bars purely contractual duties from serving as the basis for tort claims. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (2014). "[T]he critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract" is "the nature of the duty alleged to have been breached." *Id.* at 68. Thus, if the duty breached would not have existed but for the contract, the claim should be viewed as a breach of contract claim, but if the claim involves a violation "of a broader social duty owed to all individuals," then it should be regarded as a tort. *Id.*

In a similar vein, the economic loss doctrine prohibits tort claims where the entitlement to economic recovery flows only from the contract. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618–19 (3d Cir. 1995). This doctrine does not prevent tort claims where the "legal duty exists independently from any contractual obligations between the parties." *Dittman v. UPMC*, 196 A.3d 1036, 1056 (Pa. 2018).

MDR argues that Count I is barred under these doctrines because "every allegation . . . arises directly from the Franchise Agreements, which define MDR's operational, support, and fee-related obligations." (ECF No. 22-1 at 23.) It asserts that because the claims are based entirely on contractual duties, seek only economic damages, and allege no independent torty duty, these doctrines bar Count I.

But "the mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." *Bruno*, 106 A.3d at 69. Rather, a court must

focus on the "nature of the duty alleged to have been breached," and not the label imposed by the plaintiff of the claim. *Id.* at 68. Here, Backporch alleges that the misrepresentations in the FDD, including the misleading financial reports of franchises operating under different terms, were provided to the Warners for the purpose of inducing them to enter into the Franchise Agreements.

The Third Circuit's decision in *SodexoMAGIC, LLC v. Drexel University* is instructive. There, the parties entered into a contract for SodexoMAGIC to provide student food services at Drexel University. 24 F.4th at 198–200. Prior to entry into the contract, Drexel provided a projected budget based on a class size of 3,100 students—but its internal budget estimated a class size of 2,800 students. *Id.* at 199. On the day the contract was executed, *The Philadelphia Inquirer* reported that Drexel had 200 fewer students in its first-year class than prior years. *Id.* at 199–200. A subsequent "Dear Colleague" letter quoted Drexel's president asserting that the university focused on attracting a smaller pool of applicants, causing the university to operate with less revenue. *Id.* at 200. As a result of the smaller class size, revenue from student food services fell short of the projections presented in the contract negotiations. *Id.* SodexoMAGIC filed suit alleging fraudulent inducement, among other claims. In analyzing the applicability of the gist of the action doctrine, the Third Circuit noted that "it is still possible for the same act to breach both a duty under tort law and a contractual duty." *Id.* at 217. Because "a precontractual duty not to deceive through misrepresentation or concealment exists independently of a later-created contract," the court found that the doctrine did not bar the claim. *Id.*

Similarly, here Backporch alleges that MDR misrepresented financial projections while the parties were negotiating the Franchise Agreements. At the time of the alleged misrepresentation, the parties had not executed the Franchise Agreements. *See id.* Because this fraud claim would exist with or without the subsequent entry of a contract, and because this duty is grounded in one

21

generally owed to another in society and not based on a contract, it is a tort duty rather than a contract duty, and is not barred under the gist of the action or economic loss doctrine.

**F.      Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Claims**

MDR asserts that Count IV should be dismissed because a separate cause of action for good faith and fair dealing, when a cause of action for breach of contract is brought, is not recognized under Pennsylvania law. MDR further argues that Backporch fails to state a claim for breach of contract. Backporch responds that it has stated claims for breach of contract and breach of implied covenant of good faith and fair dealing, but does not address whether Pennsylvania law provides for an independent cause of action for breach of implied covenant of good faith and fair dealing.

Under Pennsylvania law, a "claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim." *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008). This implied covenant therefore does not create independent substantive rights. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013). Because Backporch's claim for breach of implied covenant of good faith and fair dealing is subsumed in its breach of contract claim, Count IV will be dismissed with prejudice.

Backporch alleges the following breaches of contract: (a) failure to provide local SEO optimization during the first year of operations in breach of Paragraph 3.6; (b) failure to establish national advertising and brand promotion in breach of Paragraph 3.7; (c) failure to provide an operational call center in accordance with Paragraph 3.9; and (d) failure to conduct market appropriate advertising and promotion in breach of Paragraph 12.5.2. (Counterclaim ¶ 27.) MDR notes that Paragraph 12.5.2 does not place any contractual obligations on MDR. Backporch does

22

not respond to this assertion. A review of the provision reveals that it only places obligations on the Franchisee, and thus it cannot serve as a basis for breach of contract by MDR.

Aside from the alleged breach involving Paragraph 12.5.2, MDR argues that Backporch alleges dissatisfaction with performance rather than that MDR failed to provide contractual obligations. To the contrary, there are no allegations in the Counterclaim that MDR performed these obligations—the allegations assert that MDR failed to do certain things it was contractually obligated to do. Backporch has thus sufficiently stated a claim for breach of contract.

G.    TCPA

MDR asserts that Backporch's TCPA claim fails because the TCPA statute of limitations bars the claim, and the TCPA cannot be applied to regulate conduct outside of Tennessee. Backporch's TCPA claim is based on the statute's prohibition of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." (Counterclaim ¶ 56 (quoting Tenn. Code Ann. § 47-18-101).) Specifically, Backporch lists six examples of alleged unfair and deceptive acts engaged in by MDR stemming from the Workbook, FDD, and other representations made by MDR. Backporch's allegations do not specify by what means MDR provided these alleged misrepresentations. Backporch also does not identify which of the enumerated unfair or deceptive acts or practices under Tenn. Code Ann. § 47-18-104(b) it alleges.

The TCPA's statute of limitations provides that any action "shall be brought within one (1) year from a person's *discovery* of the unlawful act or practice." Tenn. Code Ann. § 47-18-110 (emphasis added). As discussed above, it cannot be determined from the face of the Counterclaim when Backporch discovered the basis of its TCPA claim. While MDR emphasizes that over four years passed between execution of the initial Franchise Agreements and Backporch's Counterclaim, it is unclear at this stage when Backporch discovered the misrepresentations. It

23

remains to be determined whether Backporch discovered the alleged unfair and deceptive acts prior to September 22, 2024, one year before the Counterclaim was filed.

MDR asserts that "all relevant events here, the franchise offering, disclosure, execution, and performance, occurred in Pennsylvania under Franchise Agreement designating Bucks County, Pennsylvania as the governing forum." (ECF No. 22-1 at 22.) Backporch asserts that MDR cannot credibly contend that performance under the Franchise Agreements occurred outside of Tennessee when the Franchise Agreement sold Backporch five territories in the Nashville, Tennessee area.

The TCPA's purpose is "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2). While case law is limited addressing the geographic reach of the TCPA, "Tennessee courts interpreting the statute's reach have ruled that it is intended to apply to causes of action that are predominantly intrastate in character." *Channing Bete Co. v. Greenberg*, No. 3:19-CV-30032, 2022 WL 22837137, at *2 (D. Mass. Aug. 16, 2022). The allegations in the Counterclaim do not support that the alleged TCPA violations are predominately intrastate in character. The TCPA claim is therefore dismissed. However, because amendment would not be futile, Count V is dismissed without prejudice.

### H.    UTPCPL

MDR argues that Backporch's claim under the Pennsylvania UTPCPL is inapplicable because the statute only provides a private cause of action to consumers who purchase goods or services for "personal, family, or household purposes." (ECF No. 22-1 at 22.) In response, Backporch asserts that the Warners' intent in opening the franchises "was to secure long-term

financial stability for their family and to create a manageable work-life balance—objectives that are inherently personal and household in nature." (ECF No. 30-1 at 18.)

A private cause of action under the UTPCPL is available for a purchase "primarily for personal, family, or household purposes." 73 P.S. § 201-9.2. This is the "principal restriction" placed on the statute. *See Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 647 (Pa. Super. Ct. 1990), *aff'd*, 605 A.2d 798 (Pa. 1992). "The obvious intent of this language is to restrict claims brought under the [UTP]CPL to those which are legitimately of a consumer nature." *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722, 725 (W.D. Pa. 1987).

Backporch's exact argument and cited cases were raised and rejected in *Schaefer v. HPB Foam LLC*, No. CV 24-6298, 2025 WL 1888207 (E.D. Pa. July 8, 2025), a case also involving a franchise purchase. The court stated that "[i]t defies plausibility to say that the purchase of five [] franchises mandating royalty and other payments . . . is the purchase of goods or services primarily for personal, family, or household purposes." *Id.* at *7.

This Court agrees with the *Schaefer* court. Securing long-term financial stability and manageable work-life balance does not make a purchase of a business personal or household in nature. Rather, there is an intermediary step between purchasing the franchises and attaining long-term financial stability and work-life balance—and that step is operating a business. By Backporch's logic, any purchase of a business could be brought into the UTPCPL, and even any purchase made by a small business could fall under the UTPCPL. Backporch's UTPCPL claim is therefore dismissed with prejudice, as amendment is futile.

## I.        Mediation Pre-Condition

The Franchise Agreements contain a mediation provision, which MDR asserts Backporch was required to pursue prior to filing its Counterclaim. The provision states: "At Franchisor's

option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisors or its affiliates . . . must be submitted first to mediation . . . ." (ECF No. 17-2 at 51.) The provision further states:

> Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation. Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor.

(*Id.*)

Backporch, through its counsel, sent a letter to MDR on July 10, 2025, asserting that MDR made materially fraudulent and negligent misrepresentations, and stating that MDR's actions "give rise to claims sounding in common law fraud and misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, and statutory violations of, *inter alia*, the FTC Franchise Rule, Tennessee, and Pennsylvania law." (ECF No. 17-3 at 4–5.) This letter provided MDR with notice of Backporch's claims, including the precise nature and grounds of such claims, as required by the Franchise Agreements.

But rather than respond to this letter by seeking to exercise its option to submit the claims to mediation, MDR filed this lawsuit thirty days later, on August 9, 2025. (ECF No. 1.)[14] Further, by filing suit, MDR has placed the controversy before the Court. *See Mr. Sandless Franchise, LLC*

---

[14] MDR asserts in its Motion that it "timely elected mediation through a formal demand," but its citation to the Complaint exhibits does not support this statement.

26

*v. Karen Cesaroni LLC*, 498 F. Supp. 3d 725, 740 (E.D. Pa. 2020). MDR has not moved to stay the proceedings pending alternative dispute resolution nor has it filed a motion to compel mediation. *Id.* The Court finds that MDR has waived the mediation provision through its conduct in this litigation.

### J.    Attorneys' Fees

The Franchise Agreements provide: "If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding." (ECF No. 1-1 at 57.)

MDR's request for attorneys' fees is premature at this stage and will be denied without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Motion is granted as to Counts II, IV, V, VI. The Motion is denied as to Counts I and III. An appropriate Order follows.

BY THE COURT:

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**